UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JACQUELINE GOLD,                                                        :

                Plaintiff,                                    :          Case No.

      -against-                                            :          **COMPLAINT**

FIRST AMERICAN TITLE AGENCY, INC. d/b/a  :
FIRST AMERICAN TITLE INSURANCE
COMPANY and TITLEVEST AGENCY LLC,        :

             Defendants.                                 :
------------------------------------------------------------X

Plaintiff Jacqueline Gold ("Plaintiff" or "Ms. Gold"), by her attorneys, Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP, as and for her Complaint against defendants First American Title Agency, Inc. d/b/a First American Title Insurance Company ("First American") and TitleVest Agency LLC ("TitleVest," and together, "Defendants"), alleges upon knowledge as to herself and her own actions, and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.      Ms. Gold is a successful senior business executive with a long track-record of outstanding accomplishments. In January 2016, while employed as a Senior Vice President of Operations for TitleVest, which was owned by First American, Ms. Gold received an offer of employment from the Federal Reserve Bank of New York (the "Federal Reserve Offer"). The position offered prestige, a substantial increase in compensation, and nearly unparalleled job security. As a loyal employee acting in good faith, Ms. Gold informed Defendants that she had received a competing offer, and provided Defendants with an opportunity to match the offer.

2.     At this time, First American had recently completed a complicated multimillion-dollar business transaction involving the purchase by First American of TitleVest, and Defendants desperately needed to keep Ms. Gold in order to "smooth out" the transition period.  Given Ms. Gold's importance to the success of the transition, Defendants decided to try to prevent Ms. Gold from accepting a competing offer.  To this end, Defendants offered Ms. Gold an increase in salary that nearly matched that of the Federal Reserve Offer, and confirmed to Ms. Gold that she was a critical senior member of the team who would be highly valued at the company for years to come.  Defendants made these promises in order to induce Ms. Gold to decline the Federal Reserve Offer and continue to dedicate all of her professional efforts to Defendants.

3.     Defendants' representations and promises, however, were false and fraudulent.  Defendants never had any intention of honoring their promises to Ms. Gold.  Instead, Defendants secretly intended to employ Ms. Gold only for the shortest period required to "smooth out" the transition—a period of mere months—and then strip away her responsibilities piece-by-piece and replace her with a less qualified male.

4.     Although Ms. Gold was not aware of it at the time, she would soon learn that such discriminatory conduct was, upon information and belief, part of an egregious pattern in which First American purchased small title insurance companies and then either coerced female executives to leave through ostracization and harassment, or simply terminated them, in favor of First American's "boys club" leadership.

5.     Once Ms. Gold declined the Federal Reserve Offer in reasonable reliance on Defendants' representations and promises, Defendants immediately began to ostracize Ms. Gold in favor of employees who fell into one of two categories:  (i) men who participated in First American's "boys club" culture; or (ii) a group comprised exclusively of young conventionally-

2

attractive women known as "Brian's Angels," because they often socialized outside of work with Brian Tormey ("Tormey"), who was both President of TitleVest and Vice President of First American, and who were favored by the "boys club."  Defendants knowingly tolerated such clearly inappropriate conduct because Tormey was the largest business generator at the company, and Defendants desperately needed to keep him happy, no matter the cost.

6.      When Ms. Gold realized what was happening, she immediately and repeatedly reported the widespread misconduct at Defendants to the human resources department, following the procedures set forth in Defendants' employment manual.  Although the human resources department stated in several instances that it agreed that Tormey's conduct was entirely inappropriate, Defendants never took any remedial action because, upon information and belief, it feared losing their lead business generator.

7.      On August 22, 2017, Defendants terminated Ms. Gold's employment without cause, and replaced her with a member of the "boys club," who:  (i) possessed qualifications that were inferior to those possessed by Ms. Gold; (ii) had been based out of Chicago and had no experience performing the job of Senior Vice President of Operations in the New York market; and (iii) did not offer the company any cost savings in comparison to Ms. Gold.

8.      Defendants' termination of Ms. Gold was the result of illegal discrimination and retaliation for Ms. Gold's reports to human resources.

9.      This civil action seeks to recover compensatory and punitive damages arising from Defendants' intentional fraudulent inducement of Ms. Gold to decline the Federal Reserve Offer in favor of Defendants—despite Defendants' secret intention to jettison Ms. Gold at the soonest possible time—and Defendants' wrongful marginalization and termination of Ms. Gold based on

illegal gender and age discrimination, and in retaliation for her reporting of the widespread misconduct by Defendants' managers.

## PARTIES

10.     Ms. Gold is and was at all times herein a resident of the County of New York, State of New York.

11.     Upon information and belief, First American was and is a domestic business corporation duly organized and existing under and by virtue of the laws of the State of New York, with a principal place of business located at 101-05 Lefferts Blvd., Suite 208, S. Richmond Hill, New York 11419.

12.     Upon information and belief, TitleVest was and is a limited liability company duly organized and existing under and by virtue of the laws of the State of Delaware, and authorized to conduct business in New York.  The principal office in New York of the TitleVest division of First American is located at 110 East 42nd Street, 10th Floor, New York, New York 10017.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction to hear the merits of Ms. Gold's federal claims under 28 U.S.C. § 1331 because Ms. Gold asserts claims arising under federal law.

14.     This Court has supplemental jurisdiction over Ms. Gold's state and city law claims pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) as the judicial district in which a substantial part of the events or omissions giving rise to Ms. Gold's claim occurred.

## FACTUAL ALLEGATIONS

**A.**     **Background**

16.     Ms. Gold is a fifty-three-year-old senior business executive who has more than twenty years of experience in operations, business development, and marketing within global enterprises.

17.     Ms. Gold received degrees from New York University and Columbia Business School.

18.     In or about July 2014, Ms. Gold became employed by TitleVest as the Senior Vice President ("SVP") of Operations.

19.     As the SVP of Operations, Ms. Gold oversaw operations for the entire company and all service clients reported directly to her.

20.     In recognition of Ms. Gold's success and leadership, she received the highest available merit-based bonuses for each year that she was employed at TitleVest.

21.     Upon information and belief, in or about March 2015, TitleVest was acquired by First American.

**B.**     **After First American Acquires TitleVest, Ms. Gold Is Warned That First American Promotes A Culture Of Harassment And Discrimination.**

22.     First American touts itself in its employee manual as "an equal opportunity employer [that] is committed to an active nondiscrimination program."

23.     However, immediately after First American's acquisition of TitleVest, Ms. Gold began receiving from knowledgeable industry insiders unsolicited warnings that First American permitted and, in fact, promoted a hostile and discriminatory culture.

24.     Specifically, Ms. Gold was warned that First American fostered a "boys club," where women were routinely sidelined and offered fewer opportunities than men.

5

25.     Several female coworkers told Ms. Gold that First American had engaged in a pattern of purchasing title insurance companies, removing the management, and installing a regime controlled by almost exclusively-male employees of First American.

26.     In fact, women are drastically under-represented among First American's management and, upon information and belief, women constitute only approximately 20% of First American's executives, 30% of First American's Senior Vice Presidents, and 37% of First American's Vice Presidents.  During her employment, Ms. Gold was the sole female executive in First American's TitleVest division.

27.     In July 2016, Defendants sent Ms. Gold to First American's Emerging Leaders' Program at First American's headquarters in Santa Ana, California, which was considered a great honor and was indicative of how well Ms. Gold performed her job.

28.     The day before the event began, Ms. Gold met with two female employees of First American, both of whom told Ms. Gold that First American did not hire women at senior levels.

29.     Ms. Gold was also informed that any women in senior positions at First American were either terminated or pushed out through a culture of harassment and intolerance.

**C.     Ms. Gold Receives An Offer From The Federal Reserve, And Defendants Induce Her To Decline The Offer And Continue Working For Defendants.**

30.     In or about November 2015, Ms. Gold received a substantial raise, made effective retroactively as of July 2014, and a merit-based bonus, both of which were approved by First American, based on TitleVest's review of Ms. Gold's exceptional performance.

31.     On or about January 8, 2016, Ms. Gold received the Federal Reserve Offer, which included a considerable salary increase, additional vacation days, and the virtually unparalleled job security of working for a government agency.

32.     Out of loyalty to First American, TitleVest, and her co-workers, Ms. Gold advised Defendants that she had received an offer for substantially higher compensation and increased benefits, in order to allow Defendants an opportunity to match it.

33.     Defendants offered Ms. Gold increased compensation, although this increased compensation package did not match that of the Federal Reserve Offer.

34.     To induce Ms. Gold to accept the lower compensation package, Tormey told Ms. Gold that she had "great potential" and was considered a critical part of Defendants' leadership and growth who would be valued at the company for years to come.

35.     Tormey promised Ms. Gold that Defendants valued her and her work, and that Ms. Gold would grow with the company.

36.     As a result of Defendants' counteroffer and in reasonable reliance on Tormey's representations and promises, Ms. Gold declined the Federal Reserve Offer and continued working for Defendants.

37.     However, upon information and belief, Defendants never intended to deliver on their promises to Ms. Gold.

**D.     After Ms. Gold Declines The Federal Reserve Offer, Defendants Begin Ostracizing Ms. Gold And, Ultimately, Jettison Her Employment For Discriminatory And Retaliatory Reasons.**

38.     Once Ms. Gold declined the Federal Reserve Offer in favor of Defendants' offer, she noticed a considerable shift in the way that she was treated by Defendants.

39.     Within two weeks of when Ms. Gold declined the Federal Reserve Offer, Tormey began harassing Ms. Gold in a campaign designed to coerce her into resigning as soon as she helped Defendants through the post-acquisition transition period.

40.     Specifically, Tormey began stating that he believed Ms. Gold was overpaid, despite the fact that Tormey had personally negotiated Ms. Gold's increased compensation package.

41.     In fact, Tormey made such comments to Ms. Gold on at least three separate occasions.

42.     Ms. Gold reported Tormey's inappropriate comments to Ani Gomez ("Ms. Gomez"), Senior Human Resources Manager.

43.     Upon information and belief, Defendants never took any action in response to such reports.

44.     In or about October 2016, Tormey implied to Ms. Gold for the first time that her position was expendable, directly contradicting his prior promises that Defendants viewed her as a key executive with a bright, long-term future at the company.

45.     Ms. Gold thought that Tormey's remark was completely improper, and she immediately reported the conversation to Ms. Gomez.

46.     Ms. Gomez agreed with Ms. Gold that Tormey's comment was completely improper.

47.     However, upon information and belief, Defendants failed to take any action as a result of this report.

48.     In early 2017, several of Ms. Gold's subordinates reported to her that they were concerned and uncomfortable due to Tormey's improper preferential treatment of certain groups of employees.

49.     It was a "dirty little secret" in the office that Tormey rewarded with preferential treatment young, conventionally-attractive female employees.

50.     This discriminatory treatment was so pervasive that Tormey's favored group of young female employees became known within the office as "Brian's Angels."

51.     Tormey socialized with "Brian's Angels" outside of work in a manner that made other employees uncomfortable, and which exposed the company to substantial liability and reputational harm.

52.     For example, in or about June, 2017, while at work, one of "Brian's Angels" informed Ms. Gold that she had been out with Tormey until 4:00 a.m. the previous night, that they "had drunk way too much," and that Tormey was thrown out of the Meridian Hotel after he went into the hotel's kitchen area and began cooking hamburgers.

53.     Upon information and belief, rumors of Tormey's inappropriate conduct with subordinates were widely circulated at the company, but Defendants took no action to stop such conduct.

54.     Unlike everyone else at the company, "Brian's Angels" often received annual raises far in excess of standard raise percentages for similarly-situated employees and, upon information and belief, such raises were not tied to traditional performance metrics.

55.     Similarly, "Brian's Angels" were given coveted promotions over more qualified candidates, and were often included in meetings for managers, despite the fact that they were not in fact managers and had no subordinates reporting to them.

56.     Defendants were well aware of the preferential treatment by Tormey of his favored "Brian's Angels" group.

57.     In fact, in February 2017, Ms. Gold reported Tormey's misconduct and the situation involving "Brian's Angels" to the human resources department.

58.     As had happened with Ms. Gold's prior reports, the human resources representative agreed that Tormey's conduct was inappropriate.

59.     However, upon information and belief, Defendants again failed to take any action to remediate Tormey's wildly improper conduct.

60.     Defendants tolerated and permitted Tormey's behavior and repeatedly ignored reports about his misconduct because he was one of the largest business generators at the company.

61.     In or about March 2017, Defendants inexplicably stopped providing Ms. Gold copies of the Direct Division Reports, monthly reports that had been delivered to Ms. Gold since she began working for TitleVest and which she needed in order to perform her job.

62.     Upon realizing that she was not receiving the reports, Ms. Gold repeatedly requested them from Tormey and from John Paku ("Paku"), who was then head of the Direct Division, but Ms. Gold's requests were ignored.

63.     In April 2017, Ms. Gold discovered that Tormey had secretly excluded her from the annual salary increase decision-making process, which had been part of her job duties and in which she had always been previously involved.

64.     Subsequently in April 2017, Tormey informed Ms. Gold that Paku was being promoted to State Manager for New York, and that Tormey would be reporting to Paku from then on.

65.     Ms. Gold was never consulted in connection with this promotion, although she should have been in the normal course.

66.     When Ms. Gold inquired as to the reasons for the promotion and why she was not permitted an opportunity to apply for the position, Tormey informed Ms. Gold that Paku was "close" with First American's all-male senior management, who wanted to provide Paku a high-level position for four years until he retired.

67.     Defendants' sidelining of Ms. Gold represented:   (i) wrongful retaliation for Ms. Gold's reports to human resources about Tormey's misconduct;  and (ii) the continuation of Tormey's discriminatory harassment of Ms. Gold.

68.     During a meeting in or about May 2017, Tormey derogatorily remarked to Ms. Gold that she did not "seem" or "act" her age.

69.     In or about May 2017, when Ms. Gold attempted to discuss with Paku a hiring decision that was made without her input, Paku yelled at Ms. Gold and dismissed her.

70.     The following day, in light of the Defendants' systematic sidelining of Ms. Gold, Ms. Gold asked Paku what his expectations were of her and her work responsibilities.

71.     Paku ignored Ms. Gold and did not answer her question.

72.     Despite the absence of any formal changes to Ms. Gold's job responsibilities, on or about June 6, 2017, Paku informed Ms. Gold that contrary to prior practice, Ms. Gold was no longer in charge of company operations.

73.     Thereafter, Paku advised Ms. Gold that he would be assuming her responsibilities and, over the next two and a half months, Defendants continued to shrink Ms. Gold's responsibilities and actively exclude her from participation in the operations of TitleVest.

74.     On or about August 22, 2017, Defendants formally notified Ms. Gold that Defendants had terminated her employment.

75.     No cause was given for Ms. Gold's termination.  Rather, Ms. Gold was advised that her termination was due to "realignment" at Defendants.

76.     Upon information and belief, Ms. Gold was actually terminated for discriminatory and illegal reasons based on her age and gender including, specifically, because she was not a

member of the "boys' club" or "Brian's Angels," and because she reported the discriminatory conduct alleged herein.

77.     Upon information and belief, the decision by Defendants to terminate Ms. Gold was made by three male executives (including, without limitation, Tormey and Paku) who promoted and benefitted from the "boys' club" culture that reigned at First American, and who socialized with and favored "Brian's Angels."

78.     Upon information and belief, Paku was reassigned to Ms. Gold's former position and/or assigned Ms. Gold's former job responsibilities.

79.     Defendants' termination without cause of Ms. Gold in favor of a male executive constituted another example of the pattern described above, whereby First American purchased smaller title insurance companies, removed their management, and installed exclusively-male employees of First American as executives.

80.     Upon information and belief, Paku was ill-suited to the position and unfamiliar with the New York market, having spent most of his career in Chicago.

81.     Beginning with First American's acquisition of TitleVest, and containing throughout Ms. Gold's employment at Defendants, Ms. Gold was subject to discrimination, harassment, and humiliation, and her responsibilities were trimmed piece by piece until ultimately her job was sacrificed in favor of a member of First American's "boys club."

82.     Defendants' discriminatory conduct constituted directly contradicted their policies as set forth in their employee handbook, which provides, in relevant part:

> Our Company is an equal opportunity employer and is committed to an active nondiscrimination program.   All recruitment hiring, placements. transfers. promotions. training. compensation, benefits, discipline. and other terms and conditions of employment will be on the basis of the qualifications of the individual regardless of race, color, religion. sex (including pregnancy and childbirth), notional

origin, age (40 and over), genetic information. ancestry, physical or mental disability, sexual orientation. or any other classification protected by federal, state or local low.  The objective of our Company's nondiscrimination program is to make all employment-related decisions based solely on each individual's qualifications (merit), the bono fide occupational qualifications for the job in question, and the feasibility of any necessary job accommodations. (Handbook § 2-3).

*     *     *

Advancement is based on initiative, ability, and performance. (Handbook § 2-24).

*     *     *

Our Company's reputation is built on the principles of fair dealing and ethical conduct.  Our reputation for integrity and excellence is based upon careful observance of the spirit and letter of the law, as well as a scrupulous regard for the highest standards of conduct and personal integrity.  . . .  Considering the importance of ethical behavior, as an employee, officer, or director of First American, you should:  . . . Treat your fellow employees with dignity and respect . . . (Handbook § 4-2).

*     *     *

First American is firmly committed to a policy of nondiscrimination and the right of all employees to a work environment that is free of harassment prohibited by federal and state law. Discrimination or harassment of any employee, customer, vendor, or supplier on the basis of any category protected by federal, state or local law is prohibited.  . . .  Prohibited harassment includes. but is not limited to the following conduct:  Verbal harassment. such as unwelcome jokes, name-calling, derogatory comments and slurs/insults/taunts based on any protected category. and sexual advances, invitations, suggestions, or comments . . . . A hostile environment can be created by conduct that a reasonable person would find abusive, and that the victim subjectively perceives to be abusive. . . . Any employee who is determined to have committed such an infraction is subject to discipline, up to and including immediate termination.  The Company also prohibits retaliation against an individual who reports, or threatens to report, harassment or discrimination, or who cooperates with an investigation of a complaint.  Retaliation can consist of threats, reprimands, negative evaluations, hazing. bullying tactics, and other types of adverse treatment by a manager or coworker.  (Handbook § 4-6).

13

83.     Defendants are and were at all relevant times responsible for the actions of their managers, supervisors, employees and agents, including, without limitation, the actions alleged herein.

**E.     Ms. Gold Files A Charge Of Discrimination Before The EEOC, And Receives A Notice Of Right To Sue.**

84.     On or about September 13, 2017, Ms. Gold filed a Charge of Discrimination against Defendants with the Equal Employment Opportunity Commission ("EEOC"), based on the discriminatory conduct set forth above.

85.     On December 7, 2017, Ms. Gold received Notice of Right to Sue from the EEOC, authorizing her to proceed with litigation to vindicate her rights.

86.     All conditions precedent to the institution of this lawsuit have been fulfilled.

**AS AND FOR THE FIRST CAUSE OF ACTION**
**(Violation of the Age Discrimination in Employment Act - ADEA)**

87.     Ms. Gold repeats, realleges and incorporates by reference each of the allegations set forth in all preceding paragraphs as though fully set forth herein.

88.     The ADEA makes it unlawful to "discharge any individual or otherwise discriminate against any individual . . . because of such individual's age" or "to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." 29 U.S.C. § 623(a)(1) and (a)(2).

89.     Ms. Gold, whose date of birth is November 4, 1964, is and was at all relevant times herein within a protected class under the ADEA.

90.     Ms. Gold was at all relevant times an employee of TitleVest and/or First American and TitleVest and/or First American was her employer.

14

91.     Ms. Gold, at all relevant times, was qualified to perform her job and performed her job in a manner which fully met or exceeded Defendants' legitimate expectations.

92.     Despite Ms. Gold's experience, qualifications, and loyalty, Ms. Gold was subject to discriminatory treatment by Defendants on the basis of her age.

93.     Defendants' discriminatory treatment of Ms. Gold due to her age included, without limitation, marginalizing Ms. Gold and stripping her of her responsibilities and duties and, eventually, terminating her employment.

94.     Defendants' discrimination against Ms. Gold as described herein was willful, reckless, and done with knowledge of the requirements of the ADEA.

95.     As a result of Defendants' actions, Ms. Gold has suffered, and continues to suffer, emotional distress and monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages in an amount to be determined at trial, but which is believed to exceed $1,000,000.00, together with attorneys' fees, costs, and expenses.

96.     In addition, because Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Ms. Gold's rights, Ms. Gold is entitled to an award of punitive damages.

## AS AND FOR THE SECOND CAUSE OF ACTION
### (Violation of Title VII of the Civil Rights Act of 1964 – Gender)

97.     Ms. Gold repeats, realleges and incorporates by reference each of the allegations set forth in all preceding paragraphs as though fully set forth herein.

98.     At all relevant times, employees of Defendants were protected by Title VII of the Civil Rights Act.

99.     Ms. Gold is a woman, which placed her within a protected group (gender) under Title VII of the Civil Rights Act of 1964.

100.    Ms. Gold was at all relevant times qualified to perform the essential functions of her job.

101.    Ms. Gold was subject to adverse action by Defendants, *i.e.*, discriminatory treatment during her employment culminating in the termination of her employment.

102.    Defendants' discrimination against Ms. Gold was due to Ms. Gold's status as a woman and her status as a woman above the age of fifty, in violation of 42 U.S.C. Section 2000e-2(a).

103.    This discrimination was the result of intentional actions by Defendants, deliberate indifference by Defendants, recklessness, and/or the result of Defendants maintaining a policy or practice that has a disparate impact on women.

104.    In addition, Defendants violated Title VII by retaliating against Ms. Gold because she complained of, reported and opposed sexual harassment, age-and-gender-based discrimination, and a discriminatory work environment.

105.    Defendants' discrimination and retaliation against Ms. Gold as described herein was done with knowledge of the requirements of Title VII.

106.    As a result of Defendants' actions, Ms. Gold has suffered, and continues to suffer, emotional distress and monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages in an amount to be determined at trial, but which is believed to exceed $1,000,000.00, together with attorneys' fees, costs, and expenses.

107.    In addition, because Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Ms. Gold's rights, Ms. Gold is entitled to an award of punitive damages.

**AS AND FOR THE THIRD CAUSE OF ACTION**
**(New York State Human Rights Law - Executive Law § 296)**

108.    Ms. Gold repeats, realleges and incorporates by reference each of the allegations set forth in all preceding paragraphs as though fully set forth herein.

109.    The acts described above constitute unlawful discriminatory employment practices on the basis of age and/or sex, that violate Section 296 of the New York Executive Law.

110.    Defendants' discrimination against Ms. Gold was due to Ms. Gold's status as a woman and her status as a woman above the age of fifty.

111.    As a result of Defendants' actions, Ms. Gold has suffered, and continues to suffer, emotional distress and monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages in an amount to be determined at trial, but which is believed to exceed $1,000,000.00, together with attorneys' fees, costs, and expenses.

**AS AND FOR THE FOURTH CAUSE OF ACTION**
**(N.Y.C. Human Rights Law - Administrative Code §§ 8-101 *et seq.*)**

112.    Ms. Gold repeats, realleges and incorporates by reference each of the allegations set forth in all preceding paragraphs as though fully set forth herein.

113.    Defendants engaged in a practice or policy in which female employees were treated differently and less favorably than male employees.

114.     The acts described above constitute unlawful discriminatory employment practices, on the basis of age and/or gender, that violate Section 8-107 of the New York City Administrative Code.

115.     As a result of Defendants' actions, Ms. Gold has suffered, and continues to suffer, emotional distress and monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages in an amount to be determined at trial, but which is believed to exceed $1,000,000.00, together with attorneys' fees, costs, and expenses.

116.     In addition, because Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Ms. Gold's rights, Ms. Gold is entitled to an award of punitive damages.

## AS AND FOR THE FIFTH CAUSE OF ACTION
### (Fraudulent Inducement)

117.     Ms. Gold repeats, realleges and incorporates by reference each of the allegations set forth in all preceding paragraphs as though fully set forth herein.

118.     Defendants, their supervisors, managers, officers, employees and/or agents, made material misrepresentations to Ms. Gold about the nature of her position and how she would be treated and valued at Defendants, which were designed to induce her to decline the Federal Reserve Offer.

119.     Upon information and belief, Defendants, their supervisors, managers, officers, employees and/or agents, knew these statements were false and fraudulent.

120.     Upon information and belief, Defendants, their supervisors, managers, officers, employees and/or agents, intended for Ms. Gold to rely on these misrepresentations.

121.    Ms. Gold justifiably relied upon Defendants' material misrepresentations in declining the Federal Reserve Offer.

122.    Ms. Gold would not have declined the Federal Reserve Offer and continued working for Defendants if the true facts about Defendants' intentions had been revealed to her.

123.    As a result of Defendants' actions, Ms. Gold has suffered, and continues to suffer, emotional distress and monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages in an amount to be determined at trial, but which is believed to exceed $1,000,000.00, together with attorneys' fees, costs, and expenses.

124.    In addition, because Defendants' actions were malicious, willful, and wanton, Ms. Gold is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Gold respectfully requests that the Court enter judgment in favor of Ms. Gold and against the Defendants, jointly and severally, as follows:

a) On the First Cause of Action, in an amount to be determined at trial, but which is believed to exceed $1,000,000.00, together with punitive damages, attorneys' fees, costs, and expenses;

b) On the Second Cause of Action, in an amount to be determined at trial, but which is believed to exceed $1,000,000.00, together with punitive damages, attorneys' fees, costs, and expenses;

c) On the Third Cause of Action, in an amount to be determined at trial, but which is believed to exceed $1,000,000.00, together with attorneys' fees, costs, and expenses;

    d) On the Fourth Cause of Action, in an amount to be determined at trial, but which is believed to exceed $1,000,000.00, together with punitive damages, attorneys' fees, costs, and expenses;

    e) On the Fifth Cause of Action, in an amount to be determined at trial, but which is believed to exceed $1,000,000.00, together with punitive damages, attorneys' fees, costs, and expenses; and

    f) For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Ms. Gold hereby demands a trial by jury in this action.


WHEREFORE, the Plaintiff respectfully requests judgment granting the relief requested in each cause of action and any such other and further relief as the Court deems just, proper and equitable.


Dated: February 2, 2018
       Brooklyn, New York

                    **ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN, FORMATO, FERRARA, WOLF & CARONE, LLP**


                        */s/ Justin T. Kelton*
                    By: Justin T. Kelton (5205)
                    1 Metrotech Center, Suite 1701
                    Brooklyn, New York 11201
                    Tel:(718) 215-5300
                    Fax:(718) 215-5304
                    jkelton@abramslaw.com
                    *Attorneys for Plaintiff Jacqueline Gold*